**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **VENUS DORION** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 13 C 4721 |
| | ) | |
| v. | ) | |
| | ) | |
| **CAROLYN COLVIN** | ) | Magistrate Judge Daniel G. Martin |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Venus Dorion ("Plaintiff" or "Dorion") seeks judicial review of a final decision of Defendant Carolyn Colvin, the Commissioner of Social Security ("Commissioner"). The Commissioner denied Plaintiff's application for disability benefits under the Social Security Act in a July 27, 2011 written decision. Dorion appealed the ruling to this Court and filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision. The Commissioner filed a cross motion. The Court does not review the facts, medical records, or the Administrative Law Judge's ("ALJ") decision except as necessary in the discussion below. All relevant issues concerning Dorion's medical treatment have been carefully outlined in the parties' briefs.

### I. **Legal Standard**

**A. The Social Security Administration Standard**

In order to qualify for DIB, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not

2

disabled if he can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

### B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## II. Discussion

Dorion claims that ALJ Marlene Abrams erred in giving "minimal" weight to an opinion issued by her treating psychiatrist Dr. M. Rao. Dr. Rao treated Dorion for mental

3

impairments that stemmed, at least in large part, from a June 2006 automobile accident. Dr. Rao diagnosed Dorion as suffering from major depression, post-traumatic stress disorder ("PTSD"), and phobic disorder. The ALJ agreed at Step 2 that Dorion had the first two of these severe impairments. Dr. Rao stated in his assessment that Dorion experienced marked or extreme limitations in a number of functional areas, particularly social functioning. He also found marked or extreme limitations in several areas of Dorion's concentration, persistence or pace, as well as some activities of daily living ("ADLs").

The ALJ gave three reasons for dismissing Dr. Rao's report. She stated that (1) the psychiatrist only treated Plaintiff for approximately one year, (2) no other treating or consulting physician completely agreed with Dr. Rao, and (3) other psychiatric treatment notes contradicted his conclusions. The Court addresses each of the ALJ's reasons for discounting Dr. Rao's report in turn.

The ALJ's reliance on the fact that Dr. Rao treated Dorion for one year fails to explain why she was justified in giving little weight to the report. An adjudicator is required to consider the nature and extent of the relationship between a claimant and a physician when she weighs the expert's opinion. 20 C.F.R. § 404.1527(d). A short treatment period can be a reason for discounting an expert's report if the evidence supports a finding that the physician's knowledge or familiarity with the claimant was limited. In this case, the ALJ reached her decision without explaining why Dr. Rao's treating relationship was so brief that it justified her conclusion. Equally problematic, the ALJ relied heavily on a conflicting opinion issued by the state-agency psychologist Dr. Heinrich. The problem with that reasoning is that, unlike Dr. Rao, Dr. Heinrich never treated or examined Dorion. The ALJ

4

did not take note of that important fact.

ALJ Abrams could not logically discount Dr. Rao because he treated Dorion for one year, and then fail to explain in some minimal way why the same regulatory factor did not weigh more heavily against Dr. Heinrich. The problem is compounded by the fact that the ALJ never bothered to weigh Dr. Heinrich's opinion at all. She merely claimed that it was "consistent with the evidence as a whole." (R. 32). The opinions of non-examining experts are subject to stricter assessment standards than those of treating physicians. SSR 96-6p. In part that is because a treating physician is presumed to know the claimant's condition more fully than a non-examining doctor. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Dr. Rao was certainly far more familiar with Dorion than Dr. Heinrich was. Social Security Ruling 96-6p instructs ALJs that they "must explain the weight given to the opinions [of state-agency doctors] in their decisions." An ALJ is obligated to do so by "considering all of the factors set out in the regulations for considering opinion evidence." SSR 96-6p.

This does not necessarily mean that the ALJ was required to assign less weight to Dr. Heinrich than to Dr. Rao. An ALJ is entitled to give greater credence to a state-agency doctor than to a treating physician under certain conditions. SSR 96-6p; *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). ALJ Abrams thought that one reason for doing so was that the treating and consulting experts did not "concur completely" with Dr. Rao. (R. 33). The Commissioner fails to defend the ALJ's decision on this ground. (Dckt. 28 at 2-5). That may be because the ALJ's boilerplate statement on this issue is difficult to follow. Contrary to the implication of her claim, no treating (or even examining) expert provided an opinion concerning Dorion. The ALJ also never explained what consultant she relied

5

on to reach her conclusion. She presumably meant Dr. Heinrich. However, the ALJ failed to grasp that Dr. Heinrich did not have to fully agree with Dr. Rao. A treating doctor's opinion does not have to be confirmed in its totality by other expert reports to receive controlling weight. It must be contradicted by them on important issues that give the ALJ a reasonable ground for discounting the treating expert. SSR 96-6p; *see also* SSR 96-2p (explaining that a treating doctor's report does not even have to be "fully supported" by the medical evidence). Confirmation and contradiction do not necessarily involve the same analysis, a distinction that the ALJ did not make. The issue takes on special importance in this case because, as shown below, the ALJ significantly erred in addressing what Dr. Rao stated in his report.

Instead of explaining her reasoning on this issue, the ALJ immediately proceeded to question Dr. Rao's motive for issuing the report. She claimed that a "possibility always exists that a doctor may express an opinion" in order to assist a patient he sympathizes with. In addition, "[a]nother reality that should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians." "While it is difficult to confirm the presence of such motives," the ALJ went on to explain, "they are more likely in situations in which the opinion in question departs substantially from the rest of the evidence of record, as in the current case." (R. 33). These were by far the ALJ's most ample comments on why she discounted Dr. Rao's report.

Citing *Scheck v. Barnhart*, 357 F.3d 697 (7th Cir. 2004), the Commissioner claims this line of reasoning supports the ALJ's decision. That case provides little or no support for the Commissioner's position. It is true, of course, that an ALJ may consider whether a treating physician has been overly sympathetic in evaluating a claimant's condition. *See*

6

*Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("We must keep in mind the biases that a treating physician may bring to the disability evaluation."). But *Scheck* involved a surgeon's letter that was issued four years after the claimant's last date insured, which itself was about nine months after the surgery in question. *Scheck*, 357 F.3d at 702. The claimant's surgeon had not even seen his patient following the earlier operation. *Id*. By contrast, Dr. Rao treated Dorion up to two months prior to the October 2008 report. (R. 767). His opinion was based on his close, expert observation of his patient over a substantial period of time. That is fundamentally at odds with *Scheck.* The Court notes that the Commissioner does not apply the facts of *Scheck* to this case, or rely on any other argument to support the ALJ's position on bias.

This falls short of explaining why the ALJ was justified in questioning the objectivity of Dr. Rao's report. There is no evidence that Dorion pressured Dr. Rao to issue a favorable opinion. The ALJ's statements are phrased as speculative, rather than as factually-supported, reasons for reaching that conclusion. (R. 33, "possibility," "might," "difficult to confirm"). This is an inadequate basis for finding bias. "The ALJ must have a substantial evidentiary basis for finding a bias by the treating physician, and an otherwise medically valid opinion will not be ignored merely because of speculation that the physician was sympathetic to the claimant." *Goyco v. Colvin*, 2014 WL 5152570, at *5 (N.D. Ill. Oct. 14 2014) (citing *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009)) (internal quotes omitted). *See also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) ("[T]here is no presumption of bias in a treating physician's disability opinion."); *Micus v. Bowen*, 979 F.2d 602, 609 (7th Cir. 1992) ("The ability to consider bias, however, is not synonymous with the

7

ability to blithely reject a treating physician's opinion or to discount that physician's opportunity to have observed the claimant over a long period of time.").

The ALJ attempted to support her position by claiming that Dr. Rao might be biased because his opinion "departs substantially" from the record. Such a statement implicitly relies on the ALJ's third and final reason for discounting the expert report – her belief that Dr. Rao's opinion conflicted with the record. The Court addresses this claim by identifying the scattered comments the ALJ made about Dr. Rao throughout her decision. She did not gather these remarks together as part of a comprehensive analysis of the expert report. Nevertheless, an adjudicator's opinion must be read as a whole. *Rice v. Barnhart*, 384 F.3d 363, 370 n. 5 (7th Cir. 2004).

ALJ Abrams thought it was important that Dr. Rao did not find marked or extreme limitations in various aspects of Dorion's ADLs. (R. 31 "Notably . . . ."). That explains nothing about why his report was biased and deserved little weight. Dr. Rao filled out a form that included 11 categories of ADLs. He found extreme limitations in only two of these sub-aspects of Dorion's activities. He then hand wrote an additional category of "driving" and found an extreme restriction in it. (R. 693). One common sense inference from Dr. Rao's reluctance to assess severe limitations in most of the ADLs was that he was measured in his view of Dorion's functioning. Genuine bias would presumably have led Dr. Rao to find severe limitations in far more areas than he did. If assessing extreme limitations in only three of 12 categories casts doubt on his credibility, as the ALJ implied, then the same logic would mean that assessing all of the sub-categories as extreme would have to be seen as bolstering Dr. Rao's credibility – an obviously untenable conclusion.

In reality, the ALJ implicitly agreed that Dorion did not have serious limitations in the

8

ADLs that Dr. Rao did not mark. That should have led her to credit, not discount, his opinion on these matters. An ALJ can always agree with some parts of an expert report and reject others. *See McMurtry v. Astrue*, 749 F. Supp.2d 875, 888 (E.D. Wis. 2010) ("A treating physician's opinion may have several points; some may be given controlling weight while others may not."). Insofar as the ALJ meant something else by her comments, she should have explained the basis of her logic more clearly. As it stands, the ALJ agreed in significant part with the treating psychiatrist, then used the result of her analysis to find fault with his opinion.

The facts that underlie the ALJ's analysis of Dorion's ADLs highlight the significant problems involved her analysis. The ALJ thought that Dorion's testimony supported a conclusion that only mild restrictions existed in areas such as grooming, shopping, cleaning, and walking outside.[1] The ALJ used that finding to criticize Dr. Rao. Yet Dr. Rao never said that Dorion had serious limitations in any of these areas. The ALJ also claimed that her findings were supported by Dorion's testimony. That is clearly incorrect concerning several of the ADLs. Dorion told the ALJ that she only walked outside for 15 minutes a day. (R. 85). She also never testified that she only had a few restrictions in personal grooming. On the contrary, she stated in rather dramatic form that she often wears the same clothes three to five days in a row. She showers once every three to four days, doing so only "when I can smell or realize [I am] dirty." (R. 267). She needs reminders to

---

[1] In other parts of her decision the ALJ further relied on the fact that Dorion had gone dancing on at least one occasion to find only mild restrictions in her ADLs. (R. 27). It is unclear why the ALJ considered dancing to be an activity of daily living. As an exceptionally rare event in Dorion's current activities, it appears to be more relevant to her social functioning.

9

take care of her personal needs. Without them, Dorion only grooms herself "when I can smell my hair or body." (R. 268). The ALJ overlooked these vivid comments entirely. She was not entitled to find mild ADL restrictions in these areas, or to criticize Dr. Rao, without first accounting for what Dorion stated.

The ALJ's finding that Dorion did not have a serious restriction in her ability to drive presents similar problems. The ALJ either ignored or seriously misinterpreted what Dorion said at the hearing and wrote in her long computer diary on this issue. The record is replete with comments on Dorion's persistent fear of driving after her 2006 automobile accident. A casual review of the diary reveals an almost obsessive focus on her severe anxiety about driving. Dorion was even "freaking out while being a passenger" as of June 2007. (R. 365). Plaintiff did testify, as the ALJ reported, that she could drive to some of her doctor appointments. But she stated that she would only do so if there were "back roads" she could use. (R. 87). The ALJ relied on the fact that Dorion said she drove three times a week. However, Dorion qualified that comment by explaining that she only drove to a park less than half a mile from her house. Even then, the experience was extremely difficult for her. (R. 87, "So I at least try to stay in the car because I'm – a fear[.]"). Dorion expressed humiliation over her driving problems. (R. 368, "*I can't believe and embarrassed* [sic] *that this is even happening to me.*") (emphasis in original). Successful attempts at driving could require her "to stop after anxiety and avoidance of feeling in control took over." (R. 391). Importantly, Dorion's psychotherapist Dr. Eades confirmed her anxiety by reporting in March 2008 that driving "was way beyond her readiness and coping skills." (R. 494). This fully supports Dr. Rao's conclusion.

Dr. Rao also found that Dorion had a marked or extreme limitation in her ability to

plan, initiate, and carry out activities independently. The ALJ countered that conclusion by noting that Dorion did not need reminders to take her medication. It is not clear why Dorion's ability to take a few pills each day on her own refutes Dr. Rao's much broader findings. Even if it supports the ALJ's decision, however, the ALJ failed to draw any other link between the record and Dorion's alleged capacity for carrying out ADLs. The ALJ thought, for example, that Dr. Rao was not credible because Dorion had no significant problems in shopping or cleaning. This again ignores what Dorion actually said. She told the ALJ that her mother did most of the washing and daily chores. Dorion changes her bed sheets, but she does so in such an irregular manner that "I can smell my own odor." (R. 86). Dorion only goes shopping once a month. (R. 269). The ALJ was required to take note of this testimony before using Dorion's ADLs against Dr. Rao (or against Dorion's credibility).

Most of the ALJ's objections to Dr. Rao's report depended on Dorion's social functioning. Dr. Rao found marked or extreme limitations in five of 19 categories in this functional area. This means that the ALJ agreed with 14 of the expert's 19 findings. Once again, it is unclear why the ALJ seriously discounted the report when she concurred with large portions of it. That said, the Commissioner defends the ALJ's dismissal of the report because the ALJ noted that Dorion had maintained a relationship with her boyfriend after her accident.

The Court disagrees. The ALJ's statements on this issue fail to address what Dr. Rao said in his report. The treating psychiatrist did not find that Dorion had trouble in sustaining relationships. He concluded that she had a marked limitation in "establishing" them. (R. 693). Dorion did not establish a relationship with a boyfriend after her accident;

she maintained her pre-existing involvement with him. The interpersonal skills involved in these two activities are not necessarily identical. The ALJ cited no evidence that Dorion "established" any interpersonal or social relationship following the automobile crash that led to her impairments. Moreover, the ALJ failed to account for most of the remaining evidence concerning Plaintiff's relationship. Dorion's boyfriend testified at the hearing that they only went out about once a month. (R. 99). They do not see friends or go to movies. Dorion also expressed marked frustration with the social scope of her relationship. (R. 92, "It's not, it's, it's not normal. The only – what we do when we're together, it's either being we're at home – I avoid a lot."). They do not meet people for dinner. (R. 102). Dorion spends no time with others. (R. 270). The ALJ was obligated to explain why such limited social functioning was a ground for setting aside the expert's opinion on this issue.

As for concentration, persistence, or pace, Dr. Rao assessed marked or extreme limitations in six of eight areas. (R. 694). The ALJ thought that this was wrong because Dorion engages in ADLs without supervision. She did not address why she incorporated an ADL issue into her consideration of Dorion's concentration. As discussed above, the ALJ overstated the extent of what those ADLs included. Moreover, the ALJ failed to consider how those ADLs correlated with the limitations that Dr. Rao actually said existed. He thought that some of Dorion's functioning was not markedly limited. For example, she only had a "moderate" limitation in her attention span. No serious restrictions were noted in her ability to complete tasks in a timely manner, or in her ability to sustain tasks without unreasonable interruptions. (R. 694). Dorion's alleged ability to carry out ADLs might have stemmed from these less serious limitations. The problem is that the ALJ did not take careful note of Dr. Rao's findings on the issue.

Instead, the ALJ questioned Dr. Rao's assessment in broad terms because the ALJ thought that Dorion was "able to write extensively in her diary, work on the computer, [and] travel on her own." (R. 27). The Court is unable to follow the logic of this reasoning. Dorion's alleged travels were limited in nature and were often disruptive. The ALJ noted, for instance, that Dorion took a short trip with her boyfriend. However, she failed to account for what the trip involved. Plaintiff described it as follows:

> Went away with boyfriend on road trip. Very stressful, anxious and nerve wrecking [sic] when on expressway at high speeds. Too stressful that I wanted to go on back roads – yet once on back roads, I was very nervous as well. I avoided any anxiety meds, but did drink alcohol. Once returned, I felt as if I did accomplish something for a couple of days before getting back into the anxiously fearful mode.

(R. 428). Like Dorion's other activities, this is hardly evidence that refutes Dr. Rao's findings on Dorion's concentration.

The ALJ's focus on Dorion's extensive computer diary is especially troubling as a ground for discounting Dr. Rao. The diary consists largely of short entries, many of which are no more than two or three sentences long. Some are only one sentence. (R. 364, "Continued knee and chest pain, emotional."). Almost all of them show Dorion's serious struggles with pain, anxiety, or emotional despair. The Court chooses one at random:

> Very stiff this morning, walk woods, night walk, 5 minutes @ 2.5 on treadmill for endurance, [sic] No exercise – every other day per PT, short drive, tried sitting at computer locking up, chest and knee really hurt. No elevate or ice. 2 pain meds.

(R. 383). The ALJ never explained how such a disjointed entry (of which there are many) refutes Dr. Rao.[2] She also never asked Dorion to explain how she went about making

---

[2] The Court notes in this regard that the ALJ never referenced anything that Dorion wrote in her diary. The Court has not reached the full merits of Plaintiff's credibility claim

13

these entries. It is difficult to imagine why much concentration would be required to do so for the vast majority of them. The one quoted above can easily be typed in under two minutes. But even if long periods of time were necessary, that fails to explain why all of Dr. Rao's findings were incorrect. He stated, for example, that Dorion could not "sustain tasks without undue interruptions or distractions." (R. 694). The ALJ had no reason to use the diary entries to rebut this finding without asking Dorion to explain what was involved in making the diary entries. Maybe she took breaks when writing her longer entries. Maybe her concentration and pace were taxed to such a degree that should could not do much else afterwards. The problem is that the ALJ never asked Dorion anything about her diary, did not account for its contents, and never explained how it contradicted Dr. Rao.

The ALJ further said that Dr. Rao's findings were refuted by other psychiatric notes in the record. She explained at several points in the decision what it was in these notes that troubled her. One set of comments is stated as follows:

> However, psychiatric progress notes from 2008 through 2010 have generally indicated the claimant was considering going back to work, at least part time, including doing babysitting for her boyfriend's nephews. As preparation, she planned to go to a Hispanic grocery store and listen to people speaking Spanish to relearn the Spanish she had forgotten. She also worked on her resume.

(R. 33). This line of reasoning has given the Court considerable pause. The ALJ cited no evidence that Dorion carried out any of these plans, including her touching intention of listening to Spanish at a grocery store. Even if such evidence existed, and assuming Dorion could carry out these activities, it is well-established that a claimant's capacity to

---

for the reason stated below. But the ALJ could not have properly addressed credibility without giving some indication that she was familiar with the content of Dorion's extensive entries.

work does not necessarily refute his claim to be disabled. *See*, *e.g.*, *Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003) ("[T]he fact that a person holds down a job doesn't prove that he isn't disabled, because he may have a careless or indulgent employer or be working beyond his capacity out of desperation.") (citing cases); *see also Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("A person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, he is in fact working."); *Czarnecki v. Colvin*, 595 Fed.Appx. 635, 644 (7th Cir. 2015). The ALJ overlooked this long line of authorities. That may have been what led her to the absurd conclusion that Dr. Rao was not reliable merely because Dorion was *considering* doing the things she described.

The Commissioner claims that substantial evidence supports the ALJ's assessment of Dr. Rao because Dorion's GAF scores were between 55 and 58. As the ALJ and the Commissioner note, that places her within the "moderate" category of functioning. This is insufficient to explain why Dr. Rao was not reliable. GAF assessments must be approached with considerable caution when considering disability claims. That is because "GAF scores are more probative for assessing treatment options rather than determining functional capacity and a person's disability." *Warner v. Astrue*, 880 F. Supp.2d 935, 943 (N.D. Ind. 2012) (internal quotes and citation omitted). *See also Jones v. Colvin*, 1 F. Supp.3d 874, 977-78 (N.D. Ind. 2014) (noting that a GAF score is only a diagnostic tool that "is not the equivalent of a doctor's opinion of functional capacity and is not treated as such by the regulations"). Indeed, the latest version of the DSM "has abandoned the GAF

15

scale because of its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (internal quotes and citation to the DSM-V omitted). The ALJ did not explain how she extrapolated from the GAF score concerning treatment to find that Dr. Rao's assessment of Dorion's condition was not reliable.

Finally, the ALJ criticized Dr. Rao because the psychiatrist thought that Dorion had experienced an inability to function outside a highly supportive environment for at least one year. (R. 695). The ALJ disputed that conclusion by stating that there was "no documentation of the claimant being placed in a *structured* setting." (R. 31) (emphasis added). That conflates two issues without considering what Dr. Rao may have meant. A "structured" environment ordinarily implicates a formal arrangement outside the home. *See Gonsalves v. Astrue*, 2010 WL 1935753, at *4 (D. Me. May 10, 2010) (stating that a "structured" environment "refers to shelters or group homes, inpatient psychiatric treatment, or an inability to live on own's own"). That is not necessarily the same as a "supportive" setting. The Court distinguishes between these two terms because Dr. Rao himself did so in his report. He found that Dorion had never "been placed in a structured setting, such as a hospital, a halfway house, a congregate care living arrangement, or a group home." (R. 695). That echoes the terms of Listing 12.00(F), which describes "structured" settings as halfway houses, hospitals, board and care facilities, or an other "environment that provides similar structure." Dorion lives with her parents. She described the home as "supportive" in the manner that Dr. Rao implied. Her parents drive her. Her mother does the bulk of the cleaning and cooking. Her parents do the yard work. (R. 269). A claimant can be considered to be in a supportive environment when she lives with her parents. *See*

16

*Colcord v. Colvin*, — F. Supp.3d —, 2015 WL 589305, at *4 (D. Or. Feb. 11, 2015). The ALJ did not account for these statements, which fully accord with Dr. Rao's report.

For all these reasons, Plaintiff's motion is granted on the treating expert issue. The ALJ is directed on remand to discuss the basis of her reasoning more fully. Even if the ALJ finds that Dr. Rao's report is not entitled to controlling weight, she must explain why it deserves only "little" weight instead of "some" or "considerable" weight.

Since this case already requires remand, the Court declines to discuss the merits of Plaintiff's RFC and credibility claims. The ALJ will be required to reconsider the RFC if she concludes that Dr. Rao's report is entitled to more weight than she assigned it, or if she gives greater credence to Plaintiff. Many of the factors discussed in relation to Dr. Rao are relevant to the ALJ's credibility assessment. Plaintiff's diary is discussed above. In addition, the ALJ thought it was important that Dorion refused on occasion to take medication for her mental impairments and could not accept the mental diagnoses given to her. The ALJ presumably used these findings to discount Dorion's credibility. That overlooks what Dorion's treating psychologist stated. Dr. Angela Eades wrote Dorion a letter in August 2008 dismissing her from treatment, not because she was not ill, but because Dorion's refusal to accept the fact of her mental illness made her untreatable by Dr. Eades. (R. 769). That is not a basis for discounting Dorion's credibility. The Court trusts that on remand the ALJ will consider all the factors in SSR 96-7p and SSR 96-8p that are necessary to lead to a proper evaluation of the remaining issues.

### III. Conclusion

For these reasons Plaintiff Venus Dorion's Motion for Summary Judgment [18] is granted in part, and the Commissioner's Motion for Summary Judgment [28] is denied in

part. The Commissioner's decision is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

ENTERED:

_____
DANIEL G. MARTIN
United States Magistrate Judge

Dated: May 18, 2015.